RECEIVED
FEB 27 2018
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA, LOUISIANA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| IN THE MATTER OF PARKER DRILLING OFFSHORE USA, LLC AS THE OWNER AND OWNER PRO HAC VICE OF THE M/V MR. E.J. FOR EXONERATION FROM OR LIMITATION OF LIABILITY | DOCKET #s: 6:14-cv-00088 (LEAD) 6:14-cv-00869 (MEMBER) 6:14-cv-02843 (MEMBER) JUDGE DEE D. DRELL MAG. JUDGE CAROL WHITEHURST |

## RULING

Before the court is a claim for maintenance and cure brought by plaintiff Wilbert Mays ("Mays") against Parker Drilling Offshore, USA, LLC ("Parker Drilling"), pursuant to the Jones Act, 49 U.S.C. §30104, and general maritime law of the United States, 28 U.S.C. §1333. Mayes seeks damages for injuries he sustained on November 26, 2013 while aboard a Parker Drilling crewboat, the M.R. E.J. Mayes designates his claims as admiralty or maritime claims pursuant to Federal Rule of Civil Procedure 9(h); thus, jurisdiction is proper pursuant to 28 U.S.C. §1333.

A bench trial was held before the undersigned on March 6, 2017 to decide issues related to quantum – fault, medical causation and actual damages, if any – for alleged injuries arising from an accident that occurred on November 26, 2013.

I. FACTUAL BACKGROUND

Mays, a deckhand with Parker Drilling, finished his fourteen day shift on November 26, 2013. He and several others boarded the M.R. E.J. crewboat for transport to the Tidewater Dock. Upon boarding, Mays sat on the first bench directly behind the partition wall separating the benches from the captain's seat. Sometime thereafter, Mays fell asleep.

At approximately 6:20 p.m., while in transit in the Intracoastal Waterway, the M.R. E.J. collided with a crane barge, the MISS SUNSHINE, which was in tow by the M/V TDW.[1] The force of the collision threw Mays off of the bench and into the partition, causing it to collapse.

The M.R. E.J. ultimately made its way to the dock in LaRose, Louisiana where emergency medical personnel waited to evaluate those aboard. Mays complained of head and left knee pain but denied any back or leg pain. Emergency personnel performed a Glascow Coma Scale assessment on three separate occasions to determine the level of Mays' consciousness, and each time he scored a perfect 15/15, indicating no consciousness impairment at the time.

Mays was transported to Ochsner – St. Anne's Hospital ("St. Anne's") in Raceland, Louisiana for further evaluation. He presented at St. Anne's with complaints of pain to the left side of his face and his left knee. He denied any loss of consciousness, and, again, scored a 15/15 on the Glascow Coma Scale evaluation. A CT scan of his head showed no evidence of an intracranial bleed or facial fracture, and a CT of his neck showed mild to moderate degenerative changes of his cervical spine.[2] An x-ray of his knee showed significant arthritic issues, and the x-ray of his pelvis showed mild degenerative changes in his sacroiliac and hip joints bilaterally.

Mays was released from St. Anne's that evening with a diagnosis of a contusion involving his left knee, face, scalp and neck. He was given prescriptions for Flexeril for muscle spasm and Tramadol for pain. Following his release, Mays stayed overnight at the home of a friend and the following day, drove himself home to Jonesville, Louisiana.

Shortly thereafter, Mays engaged the assistance of his attorney, who referred Mays to Dr. Gerald Leglue, Jr., a physical medicine and rehabilitation physician in Alexandria, Louisiana, for

---

[1] The barge and tow were owned by Tassin International and operated by Dean Equipment.
[2] Medical personnel at St. Anne's also administered a drug test which came back positive for THC. Based on that positive result and Parker Drilling's zero tolerance drug policy, Mays was terminated.

evaluation. Dr. Leglue began treating Mays on December 3, 2013, for complaints of face and jaw pain, headaches, dizziness and pain in his neck, left shoulder, lower back and left knee. Over the course of treatment, Dr. Leglue also referred Mays to several other physicians for evaluation and input.

Dr. Terry Texada, an orthopedist in Alexandria, Louisiana, began treating Mays on December 9, 2013, for the injuries to his left knee. Dr. Texada reviewed the x-ray taken on the date of the accident and conducted a physical exam. Dr. Texada found Mays suffered from pre-existing degenerative joint disease, questionable meniscal pathology, and a possible ligament injury. He drained serous fluid from Mays' knee and referred him for an MRI.

The MRI, conducted on December 12, 2013, confirmed the degenerative joint disease and a torn meniscus. Dr. Texada performed arthroscopic surgery on January 20, 2014, to address the torn meniscus and as much of the degenerative changes as he could. He continued to treat Mays post-operatively through April 21, 2014, at which time he advised Mays there was nothing more he could do to address the existing degenerative changes to his knee.

Dr. George Williams, an orthopedic surgeon in Opelousas, Louisiana, began treating Mays on March 18, 2014, for lumbar and cervical spine pain resulting from pre-existing moderate to severe degenerative disc disease and stenosis. In addition to degenerative disc disease, Dr. Williams diagnosed Mays with a herniated nucleus pulposus at C5-C6, radiculopathy, spondylosis in his cervical spine as well as pain and spondylosis in his lumbar spine and he ultimately recommended a cervical discectomy and fusion based primarily upon Mays' complaints of pain.

Mays continued to see Dr. Williams off and on through February 2017. As of September 2016, Mays reported pain in his lumbar spine when lying down but he did not report any more cervical pain once he began receiving injections. Records from that September 2016 visit and his

3

follow up visit in January 2017 reveal Mays walked with a normal heel toe gait but he continued to complain of lumbar pain at rest. However, he made no complaints of cervical pain until he returned in February 2017.

During much of this same time period, Mays also sought the advice of Dr. Mortenza Shamsnia, a neurologist in Metairie, Louisiana. Mays' initial appointment with Dr. Shamsnia was in May 2014. Based upon a physical exam conducted on the first day, Dr. Shamsnia diagnosed Mays with "posttraumatic headaches, memory loss, neck pain and low back pain, and dizziness." Though Dr. Shamsnia "need[ed] to review [Mays'] medical records in detail", he never obtained any medical records from the date of the accident nor prior imaging records, with the exception of an April 2014, MRI of Mays' lumbar spine. Nevertheless, Dr. Shamsnia diagnosed Mays with a "postconcussion syndrome with memory loss and attention deficit."

On December 14, 2016, over three years after the accident, Mays underwent a high resolution MRI of his brain. From that, Dr. Shamsnia opined Mays suffered a traumatic head injury on the date of the accident as evidenced by brain atrophy from a prior hemorrhage in the left caudate nucleus of the brain. Dr. Shamsnia further opined that this injury was consistent with Mays having experienced persistent headaches, memory loss, and mood changes and his prognosis was quite poor as the symptoms would likely worsen over time and ultimately result in early onset dementia and impaired cognitive function.

Dr. Shamsnia's records further reveal he treated Mays for insomnia, anxiety, and depression following initial psychological treatment rendered by James Quillen, Ph.D., a clinical psychologist in Alexandria, Louisiana. Treatment records from Dr. Quillen indicate he treated Mays throughout most of 2015 for post-traumatic stress disorder with depressive features, possible mild post concussive features by history, dysfunctional pain adjustment with secondary adaptive

features, and intermittent explosive symptomology. During his visits, Mays consistently complained about being depressed but reported his nightmares and explosive outburst were managed by the medications prescribed by Dr. Quillen.

At trial, Mays again reported changes in his mood and that he experienced nightmares he attributed to the accident. He complained of chronic cervical and lumbar pain, carpal tunnel syndrome, permanent and persistent pain in his left knee that restricted his mobility, and a serious, permanent brain injury which resulted in headaches and memory loss that he was told would progress over time.

## II. LAW AND ANALYSIS

### a. Maintenance and Cure

"Maintenance and cure is a contractual form of compensation afforded by the general maritime law to seaman who fall ill or are injured while in the service of a vessel." Jauch v. Nautical Servs., Inc., 470 F.3d 207, 212 (5th Cir.2006) citing McCorpen v. Cent. Gulf. S.S. Corp., 396 F.2d 547, 548 (5th Cir.1968). An employer has an obligation to provide maintenance and cure when a seaman is injured on a vessel regardless of fault. There is no dispute that Mays is a seaman and entitled to maintenance and cure. The issue before the court is whether he is owed any additional amounts and, if so, whether Parker Drilling willfully failed to pay those amounts.

### i. Maintenance

Maintenance, a per diem living allowance for food, lodging and transportation to and from a medical facility, and cure, payment of medical, hospital and therapeutic expenses, are owed until the seaman reaches maximum cure. See Alario v. Offshore Service Vessels, L.L.C., 477 Fed.Appx.186 (5th Cir.2012) citing Vaughn v. Atkinson, 396 U.S. 527, 531 (1973). Parker Drilling paid Mays $35.00 a day in maintenance payments until April 3, 2015, when it reduced the payment.

Parker Drilling based the adjustment on Mays' own March 2, 2015, deposition testimony that he spent, on average, $100 a month on food, $125 a month for electricity, and $60.00 for water and gas, and his only other bill was for cell phone charges. Based upon this testimony, Parker Drilling reduced the amount of Mays' monthly maintenance payment to $15.00 per day.

As explained by the Fifth Circuit in Hall v Noble Drilling (U.S.) Inc., 242 F.3d 582 (5th Cir, 2001),

> A plaintiff who is a seaman injured while in the service of a vessel is entitled to maintenance if he incurred the costs of food and lodging during that period. The plaintiff must present evidence to the court that is sufficient to provide an evidentiary basis for the court to estimate his actual costs. If the plaintiff presents no evidence of actual expense, the plaintiff may not recover maintenance.

Id. at 590.

The Court went on to explain an exception to the rule that a seaman be paid only for food and lodging costs incurred is applicable when the court concludes that the plaintiff's actual expenses are inadequate to provide him with reasonable food and lodging. Id. Here, the evidence presented is Mays' own testimony. The defense relies upon Mays' March 2015 deposition testimony stated above. However, at trial, Mays' counsel elicited testimony from him that Mays' average monthly expense for food ranged between $400 and $500 and his electricity, gas, and water expenses ranged from $195-$210.

Though it was not unreasonable for Parker Drilling to rely upon Mays' own testimony that his monthly food expenses were $100 a month[3], the Court finds $100 a month inadequate to constitute a reasonable food expense. Accordingly, we find Mays' expenses to be $450 per month for food. As for utilities, we find that the passage of time between the Mays' deposition and the date of trial likely resulted in the difference between the average monthly payments. In light of

---

[3] Given the fact Mays lived rent free at a home owned by his brother and admittedly ate meals at his sister's home, it was not unreasonable to believe his food expense might also be covered, in part, by family.

6

our finding that Mays reached maximum medical improvement ("MMI") by March 8, 2016, (as explained in detail below), we rely upon the former accounting of utility payments of $185 in determining a proper maintenance award. Accordingly, based upon Mays' monthly maintenance expenses totaling $635 a month and his MMI date of March 8, 2016, we find Parker Drilling would have owed Mays an additional $8 a day or an additional $215 a month from April 3, 2015 through March 8, 2016. However, as Parker Drilling continued to pay maintenance and cure through the date of trial, March 6, 2017, at the rate of $15 day, no additional actual award is warranted.

A shipowner who is in fact liable for maintenance and cure but who reasonably denies the payments may be held liable only for the amount of maintenance and cure. Morales v. Garijak, Inc., 829 F.2d 1355, 1358 (5th Cir.1987), abrogated on other grounds by Guevera v. Maritime Overseas Corp., 59 F.3d 1496 (5th Cir.1995). A failure to pay maintenance and cure is reasonable if a diligent investigation indicates the seaman's claim is not legitimate or if the seaman does not submit medical reports to document his claim. Morales, 829 F.2d at 1360. If a shipowner refuses maintenance and cure without a reasonable defense, the shipowner becomes liable for compensatory damages in addition to maintenance and cure. MNM Boats, Inc. v. Johnson, 248 F.3d 1139, *1 (5th Cir2001)(unpublished opinion); Morales, 829 F.2d at 1358. If the shipowner rejects the claim in an arbitrary and capricious, or willful, callous, and persistent manner, he becomes liable for punitive damages and attorneys' fees as well as maintenance and cure and compensatory damages. Chet Morrison Contractors, Inc., 666 F.3d 373, 382 (5th Cir.2012); Morales, 829 F.2d at 1358; See Richard v. Bauer Dredging Co., 433 F.2d 955 (5th Cir.1970) (per curiam).

As we stated, Parker Drilling's reliance upon Mays' testimony was not unreasonable as the reduction in pay was based upon Mays' own testimony. The decision, while erroneous, was neither

7

unreasonable nor arbitrary, capricious, willful or callous. Accordingly, neither compensatory damages nor attorneys' fees are warranted under the circumstances.

### ii. Cure

Maximum cure is achieved when it appears probable that further treatments will not result in betterment of a seaman's condition. Rashidi v. American President Lines, 96 F.3d 124 (5th Cir.1987). It is proper to declare maximum cure when a seaman's condition is incurable or that future treatment will relieve pain and suffering but not otherwise improve the seaman's condition. See Barto v. Shore Const., L.L.C., 801 F.3d 465, 476 (5th Cir.2015). "[W]hen there are ambiguities or doubts [as to a seaman's right to receive maintenance and cure], they are to be resolved in favor of the seaman." Johnson v. Marlin Drilling Co., 893 F.2d 77, 79 (5th Cir.1990) (quoting Vaughan v. Atkinson, 369 U.S. 527, 532 (1962)) (internal quotation marks omitted) (alteration in original). "[W]hen a particular medical procedure is merely palliative in nature or serves only to relieve pain and suffering, no duty to provide payments for cure exists." Johnston v. Tidewater Marine Serv., 116 F.3d 478, at *2 (5th Cir.1997) (per curium) (unpublished table opinion).

Dr. Texada informed Mays on April 21, 2014, that he could do nothing more to treat the already existing advanced degenerative changes in his knee; accordingly, we find Mays reached MMI, with respect to his knee, on that date.

Dr. Williams noted that Mays' degenerative disc disease and stenosis pre-dated the accident, but he believed the boat accident exacerbated the condition. This same finding was later reached by Dr. Thomas Brennan, a neurosurgeon in New Orleans, Louisiana, who conducted an independent medical examination on July 18, 2014. The two disagreed as to whether the cervical spine surgery recommended by Dr. Williams was warranted. As of trial, none of Mays' treating

8

physicians determined he reached MMI as to his neck and back. We find Mays reached MMI as to his neck and back by March 8, 2016, as explained below.

Between October 2015 and September 2016, Mays did not seek treatment from Dr. Williams and he only reported to Dr. Shamsnia once, in May 2016. During that time period, Mays was deposed and video surveillance was conducted. The evidence deduced from both depicts a physically able Mays. While we recognize surveillance video can be slanted, there are a sufficient number of dates between May 2014 and January 2017 on which surveillance was conducted for us to be convinced, in this case, that the video provides a credible and genuine timeline of Mays' recovery.

In May 2014, video surveillance showed Mays ambulated with a limp and used his cane consistently. The video footage corresponded with the physical condition he reported to Drs. Leglue and Texada.

By January 2015, video surveillance showed his gait was guarded and he continued to carry the cane; however, he was not relying upon it with the same frequency. Medical records show continued complaints of pain at this time and that he was undergoing injections to alleviate that pain.

On March 2, 2015, Mays relayed in his deposition that his knee pain rated a five on a scale of one to ten and his back pain rated "about a seven." However, he found the injections helped alleviate the pain and he intended to follow up with additional injections.

Video from May and June 2015, showed Mays walking around his yard without a cane and his gait was consistent with a swagger rather than the aforementioned limp. He easily maneuvered in and out of the cab of his truck. Even after traveling to and from Alexandria over the better part

of a day for a doctor's appointment, he easily exited his vehicle and walked around without signs of soreness, limping, or hesitation.

During Mays' deposition on March 8, 2016, he admitted he did not experience pain in his lumbar spine except when he lay down, and the only time his neck hurt was when he tried to hold it up. Nevertheless, he engaged in what he deemed "light work" which included mowing his lawn using a push mower, raking leaves, washing the exterior and interior of his trucks and a few other people's vehicles, and lifting as much as 40 or 50 pounds. He did these things despite the fact he was under orders from Dr. Williams' not to engage in heavy lifting, bending, or twisting. Surveillance video from this same time period confirmed that Mays detailed cars, easily entered and exited the cab of his truck, walked without the assistance of his cane (both around town and his yard) and without a limp. He continued to engage in repetitive bending and squatting without wincing or guarding, and he continued to reach into and lift items out of the bed of his truck.

When Dr. Williams was deposed on August 9, 2016, he advised he had not seen Mays since October 2015, and he acknowledged Mays complaints of pain did not comport with the type of activity he saw Mays engage in during video surveillance he viewed from December 2015. Dr. Williams further stated that based on the video images (which did not show favoritism toward the neck or back) and his understanding of Mays deposition testimony that he could wash cars, mow lawns, and lift 40 to 50 pounds, Mays' condition had improved. Further, Dr. Williams stated he would not recommend nor perform surgery on someone who was not experiencing pain.

Surveillance video from November 2016 and January 2017 continued to confirm Mays' engaged in the same physical activity without hesitation, guarding or wincing. He walked without a cane or a limp; regularly visited a convenience store to pick up drinks and cigarettes; walked the dog; continued to enter and exit the cab of his truck without hesitation or effort; washed vehicles;

10

raised his arms above his head; and engaged in activities that required him to twist, bend, stoop, and squat. Moreover, medical records from Dr. Williams during this same time indicate no complaints of cervical pain and denote that Mays walked with a normal heel – toe gait.

It was only at the eve of trial, February 16, 2017, when Mays returned to Dr. Williams and renewed his complaints of cervical pain. Oddly, Dr. Williams again recommend surgery for Mays during his February 21, 2017 trial deposition, citing those complaints as the basis for the recommendation. Again, however, Dr. Williams acknowledged that he did not find any worsening of Mays prior degenerative condition; he did not note any appreciable objective findings of sensory or motor deficits upon physical exam; and, he would not recommend surgery on someone who was not complaining of pain.

Based upon this record evidence, the court finds Mays' trial testimony unreliable if not incredible and does not find that Dr. Williams' recommendation for surgery is based upon an ongoing exacerbation of symptoms caused by the accident.

With respect to his head injury, we do not find sufficient evidence to support Dr. Shamsnia's surprising diagnosis that Mays suffered a traumatic brain injury on the date of the accident. Dr. Shamsnia's diagnosis was made without ever reviewing the medical records from the date of the accident. Though Dr. Shamsnia argued Mays' denial of loss of consciousness, consistent Glascow Trauma scores of 15 out of 15, and a CT scan of his head that was negative for inter-cranial bleeding did not negate a finding of a mild or moderate traumatic brain injury, he acknowledged that the most common cause of a caudate hemorrhage was (non-accident caused) arterial hypertension from which Mays suffered.[4] Moreover, the doctor conceded that he did not

---

[4] In 2015, Dr. Quillen urged Mays to see his primary care physician regarding his high blood pressure. There is no indication that he did so, and Dr. Shamsnia's own records reveal he too counseled Mays on the dangers. Specifically, Dr. Shamsnia's notes from May 2016 state that he and Mays discussed "in detail" Mays' elevated blood

11

rule that out as a cause, only that he did not believe it to be. This, coupled with the fact that the time frame the hemorrhage occurred could not be determined, leaves the court without sufficient evidence to find the head injury found on the high resolution MRI was a result of the accident.

While Mays seeks cure payments for expenses incurred for: medical appointments with Dr. Leglue from December 3, 2013 through December 21, 2016; prescriptions filled at Sentry Drugs between December 3, 2013 and September 8, 2016; a high resolution MRI of his brain performed on December 14, 2016; a stand-up MRI conducted February 6, 2017; and an appointment with Dr. Williams on February 16, 2016, we find the majority of these expenses are not covered. Only those expenses incurred prior to March 8, 2016 shall be paid by the defendants. Accordingly, the total award for cure award owed to Mays is $8,263.48, which is comprised of $3,350.00 in expenses incurred with Dr. Leglue and $4,913.48[5] for prescriptions filled by Mays at Sentry Drugs.[6]

### b. Damages

The court now addresses to what extent Mays is owed for all general damages (including pain and suffering), past and future unpaid medical expenses, and past and future loss of earnings.

### i. General Damages

Mays underwent arthroscopic surgery on his left knee to repair the torn meniscus which was caused by the accident. Aforementioned evidence establishes that Mays recovered well from that surgery and any ongoing problems are related to significant arthritic changes predating the

---

pressure and need for blood pressure medication; and, "[a]pparently [sic] that has been an issue and I am seriously concerned a lot with his blood pressure."

[5] This amount is based upon the prescription prices which totaled $4,679.52 and the 5% sales tax calculated to be $233.98. This also reflects a reduction for Duexis which was billed at $1,782.00 and reimbursed at $50.00 as Duexis is nothing more than a combination of two over the counter medications (ibuprofen and famotidine) that can be obtained for significantly less if taken separately.

[6] A prescription in the amount of $30.89 on December 12, 2013 was excluded as it was issued by Dr. Renick Webb and there is no evidence in the record to indicate Mays' visit with Dr. Webb or the corresponding prescription relates in any way to the accident.

12

accident. We are also satisfied that Mays also suffered an exacerbation of pre-existing degenerative changes to his cervical and lumbar spine which resolved by March 8, 2016, if not sooner. Finally, Mays proved by a slight preponderance of the evidence that his anxiety and depression are related to some form of post-traumatic stress disorder which was caused by the accident. Based upon the quantum research submitted by counsel for both sides and our independent research, the court finds an award of $125,000 appropriate in this matter for these injuries.

As the court found Mays did not sustain a head injury at the time of the accident, an award of damages is not applicable. The only evidence regarding the need for a carpel tunnel release was a mention in Dr. Shamsnia's records. No complaints of wrist pain nor any causal connection between the accident and the diagnoses was ever presented. Accordingly, that demand for damages is also inappropriate.

### ii. Medical Expenses

Mays seeks damages to compensate for various medical expenses he has or will incur post trial. Among the expenses are a cervical discectomy and fusion. As the court explained above, we find that all injuries sustained in the accident resolved on or before March 8, 2016. Dr. Williams' recommendation for surgical intervention, specifically, a three level cervical discectomy and fusion, is primarily based upon Mays' subjective complaints which the court deems unreliable. Video surveillance shows Mays is easily able to engage in activities from which Dr. Williams restricted him. Moreover, Dr. Williams testified in his deposition that he would not recommend surgery based on what he saw in the video surveillance and based upon Mays' own March 8, 2016 deposition testimony. Though Dr. Williams did not fully recant his recommendation for surgery,

his qualifying statements and the evidence presented in this case warrant the denial of damages or award for expenses related to the proposed a cervical discectomy and fusion.

As we do not find that Mays sustained a traumatic brain injury or carpel tunnel syndrome as a result of the accident, medical expenses for past or future treatment of these conditions is not awarded.

Finally, we do not find further psychological treatment is in the offing for Mays as his testimony lacks credibility.

### iii. Lost Earnings

A plaintiff may recover damages for past and/or future lost earnings. Such lost earnings are generally lost wages, but, where proven, may include lost earning capacity. Past lost earnings are usually measured by the actual wage loss incurred by a seaman from the date of the accident through the date of trial. Future wage loss is calculated using a four step method established by the Fifth Circuit in Culver v. Slater Boat Co., 722 F.2d 114 (5th Cir.1983) (hereinafter referred to as Culver II). The four step method includes: (1) estimating the loss of work life or expected remaining work life; (2) calculating the lost income stream; (3) computing the total lost income stream; and (4) discounting that total to present value. Id. at 117. The calculation must then consider taxes and reflect a net payment. Norfolk & W. Ry. V. Liepelt, 444 U.S. 490, 493-94 (1980).

Both parties provided reports from economists. Mays provided reports from Charles O. Bettinger III, Ph.D. and defendants provided reports from Kenneth J. Boudreaux, Ph.D. Though both are familiar with and cite Culver II in arriving at their projections, the assumptions made within their reports differ substantially. For example, where Dr. Boudreaux relies upon the U.S. Department of Labor Statistics (Bulletin 2254, February 1986, as updated in Ciecka, Donley and

14

Goldman, Journal of Legal Economics, Vols. 9, No. 3 (Winter 1999-2000) and 10, No. 3 (Winter 2000-2001, Dr. Bettinger adopts what he terms "a normal male retirement age of 65."[7] Additionally, where Dr. Boudreaux averaged Mays' earnings from 2006 through 2013 to reach an annual pretax income base, Dr. Bettinger relies heavily on Culver II's statement that an earnings calculation begins with consideration of wages "at the time of the accident" and uses his 2013 earnings of $44,106.67. Finally, the two vary as to whether fringe benefits should be included and whether a downturn in the oil and gas economy should be considered.

After consideration of both reports, the court makes the following findings for the following reasons. First, the court adopts Dr. Boudreaux's work life average and not a "normal male retirement age." Dr. Bettinger's assumption clearly does not take into account Mays' overall physical condition nor does it consider interim labor separations which are evidenced by Mays' own work history. These considerations are consistently noted as reasons why the Fifth Circuit in Culver II and the courts applying the Culver II framework adopt a work life average rather than a retirement age as the proper standard. Second, we adopt Dr. Boudreaux's use of an average of past income to reach the correct annual income figure of $28,809.36.[8] The record evidence shows Mays' work history was inconsistent and that he did not remain in employment within the oil and gas industry for any significant period of time. Thus, we determine a figure commensurate solely with his income in 2013 to be significantly inflated. We also find that Dr. Boudreaux's use of an

---

[7] Based on a listing of information reviewed in advance of preparing his report, we assume Dr. Bettinger relies upon the "Civilian Labor Force and Participation Rates with Projections, 1980-2018," Table No. 587, U.S. Census Bureau, Statistical Abstract of the United States: 2012, (131st Ed.) Washington, D.C. in adopting this age upon which to base Mays' work life.

[8] Various courts, including the Fifth Circuit, have adopted the use of an average earnings calculation when the plaintiff has held various jobs at differing rates of pay. See Nelson v. Cooper T. Smith Stevedoring Co., Inc., 2013 WL 4591362, *1 (E.D.La.2013), citing In re Parker Drilling Offshore USA, LLC, 323 App'x 330, 335 (5th Cir.2009); Levine v. Zapata Protein (USA), Inc., 961 F.Supp 942, 945-46 (E.D.La.1996). See also, Tran v. Abdon Callais Offshore, LLC, 2014 WL 12538905; Scardina v. Maersk Line, Ltd, 2002 WL 1585566 (E.D.La.2002).

average of Mays' earnings over an eight year period is fair and equitable as it even takes into consideration years where his pay was much higher. Additionally, by taking an average of eight years, versus the usual five, less weight is afforded to year five (2009) when Mays did not earn any income.[9]

Based upon that annualized income figure, Dr. Boudreaux calculated a past loss from the date of the accident through the date of trial in the amount of $78,062.70 which the court adopts as the award to which Mays is entitled to compensate him for all past lost earnings.

As for future lost earnings, we note it is undisputed that Mays will not return to work as a deckhand given his physical condition. Even at MMI, he cannot lift the amount of weight required to secure medium work as his lifting of 40 to 50 pounds was only shown to be occasional. As such, we find Mays capable of returning to light work. However, we also note and adopt the finding of Vocational Rehabilitation Counselor Ted Deshotels, LRC, CRC, CLCP, that Mays' geographical location presents its own set of problems in finding employment and the low hourly rates that accompany the positions. Thus, we base his calculation of future loss on an hourly wage of $7.60 or a net of $15,808.00 per year. After multiplying this figure by his remaining work life of 9.08 years and appropriately discounting that amount, we find Mays' awardable future loss of earnings to be $88,539.26.

III. **Prejudgment Interest**

As the court's admiralty jurisdiction was invoked under Federal Rule of Civil Procedure 9(h) and because the case was tried to the bench, an award of prejudgment interest is within the discretion of the court. <u>Williams v. Reading and Bates Drilling Co.</u>, 750 F.2d 487 (5th Cir.1972). See also <u>Doucet v. Wheless Drilling</u>, 467 F.2d 336 (5th Cir.1972); <u>Bush v. Diamond Offshore Co.</u>,

---

[9] In 2009, Mays earned no income, and in years 2007 and 2008, he earned significantly more income than in most other years.

46 F.Supp.2d 515, 523 (E.D.La.1999); and In re Parish of Plaquemines as Owner of M/V Pointe-A-La-Hache, 231 F.Supp.2d 506 (E.D.La.2002). The court finds that an award of prejudgment interest is not warranted in this case as Mays received maintenance and cure payments through trial and made no effort to mitigate his economic damages.

I. **CONCLUSION**

For the foregoing reasons, this court renders judgment in favor of Mays and against defendants in the amount of $299,865.44 with interest from the date of judgment until paid for all costs.

The parties are **ORDERED** to present a judgment agreed to as to form reflecting the ruling of this court within ten (10) days of receipt of this ruling.

SIGNED on this 27 day of February, 2018 at Alexandria, Louisiana.

JUDGE DEE D. DRELL
UNITED STATES DISTRICT COURT